OPINION OF THE COURT
Dennis K. McDermott, J.
*225 The defendant has been indicted and charged with a single count of making a terroristic threat, a class D violent felony (Penal Law § 490.20). As part of the relief granted to the defendant on his omnibus pretrial motion, the court has reviewed the transcript of the presentation of this case to the grand jury for the purpose of determining whether the evidence presented was sufficient to support the indictment.
Section 490.20 of the Penal Law is part of article 490 (“Terrorism”) enacted by the State Legislature shortly after the infamous terrorist attacks of September 11, 2001 to meet what it determined to be “the compelling need for legislation that is specifically designed to combat the evils of terrorism.” (Penal Law § 490.00 [“Legislative findings”].) My legal research shows no reported decisions under this article, and I am aware of no unreported decision save for my own decision in the case of People v Jenner (Madison County, Docket No. 2004-0046), which was tried to a jury verdict in November 2004.
Elements of the Offense
The statute requires three elements to be proved: an act, an intent, and a result.
(A) The Act:
The defendant must threaten “to commit or cause to be committed a specified offense” (Penal Law § 490.20 [1]). The term “specified offense” is defined in Penal Law § 490.05 (3) (a) and includes, inter alia, any class A felony offense other than one defined in Penal Law article 220 (“Controlled Substances Offenses”). Thus, a threat to commit murder, in either the first or second degree (Penal Law §§ 125.27, 125.25), would satisfy this element of the crime.
It is not necessary that the defendant threaten to commit the specified offense personally. A threat to cause the specified offense to be committed by another is sufficient.
(B) The Intent:
The statute provides that the threat must be made with any one of three different intentions: (1) to intimidate or coerce a civilian population, (2) to influence the policy of a unit of government by intimidation or coercion, or (3) to affect the conduct of a unit of government by murder, assassination or kidnapping.
(C) The Result:
The threat, made with the requisite intent, must cause “a reasonable expectation or fear of the imminent commission of such offense.” (Penal Law § 490.20 [1].)
*226 This element has two components. The commission of the threatened conduct must appear to be imminent, and the expectation or fear thereof must be reasonable. Thus, there is an objective standard to be applied in the analysis. (Donnino, Practice Commentaries, McKinney’s Cons Laws of NY, Book 39, Penal Law art 490, 2005 Pocket Part, at 155.)
Nondefenses:
Section 490.20 (2) specifically provides that it is not a defense that the defendant did not have the intent or capability of actually carrying out the threat, nor is it a defense that the threat was made to someone other than the person who was the subject of the threat.
Alleged Facts
Madison County District Attorney Donald Cerio testified that on July 14, 2004 he received a letter at his office purporting to be from the defendant.* The letter, which is laced with obscenities, begins by referencing section 490.00 of the Penal Law which “tells you of some past events like the one I am currently planning, i.e., World Trade Center, Columbine, Pan Am, et cetera.” Next, the letter mentions that “we have some friends in common,” and then names various individuals involved in the pending prosecution of the defendant’s father, the aforementioned Donald Jenner.
By way of background, Jenner was a level III sex offender (see generally Correction Law art 6-C [“Sex Offender Registration Act”]) who began cohabiting in Onondaga County with a woman after her children had been removed from her custody in a neglect proceeding pending in the Family Court, Madison County. Caseworkers from the Social Services Departments in Onondaga County and Madison County had informed Jenner’s paramour that her children could not be returned while she was living with an untreated sex offender and that she would have to choose between Jenner and her children. Jenner had returned to his apartment unexpectedly to find the Onondaga County caseworker meeting with his girlfriend and, upon hearing the caseworker tell the girlfriend that she would have to make a choice, he flew into a rage and threatened to kill both the Madison County caseworker and her supervisor. Jenner was charged with making a terroristic threat and was in the Madison County *227 Jail awaiting his trial at the time this letter was allegedly written.
The individuals mentioned in the letter were the caseworkers from Onondaga and Madison counties, the Onondaga County District Attorney and one of his investigators, the Madison County Commissioner of Social Services, one of Jenner’s attorneys, and various police officers involved in Jenner’s case. After naming them, the letter states, “All of the above named niggers are going to be killed by the end of the year.” The letter continues,
“I believe you have a couple of open terrorist cases open [sic]. If you want your death sentence commuted, then drop any associated cases that fit the above description, you cracker. Madison County Courthouse, along with the Department of Social Services, is going to look like the Oklahoma City Federal Building. I am also going to personally slit your wife and your kids’ throats.”
It concludes, “I assure you, this is not a joke or a prank. YOU ARE FUCKING DEAD!!!”
Cerio testified to the grand jury that, upon receiving this letter, he was frightened and fearful, that he notified all of the named individuals of the threat, began carrying a firearm with him at all times, and took additional steps to safeguard his family and home.
The grand jury also heard the testimony of New York State Police Investigator Mark Nell. Nell testified that he was assigned to investigate the matter and went to visit the defendant in the Public Safety Building in Syracuse the day after the threat was received. The defendant acknowledged writing the letter and stated that “Cerio would be the first to go.”
Analysis
The defendant unequivocally threatened to murder, or cause the murder of, the District Attorney of Madison County and other persons involved in his father’s prosecution. Given the defendant’s incarceration at the time, it would be highly unlikely that he could have committed the murders himself, but the only acts he specifically threatened to commit personally were in reference to the District Attorney’s wife and children. Threatening that the specifically named persons “are going to be killed by the end of the year” is enough to satisfy the requirement that he threaten to cause the murders to be committed.
*228 The defendant’s intent is equally clear. He tells the District Attorney that the only way to avoid death is to drop the case against his father. Thus, the defendant’s manifest intent is to affect the conduct of a unit of government (here, the District Attorney’s office) by a threat of murder.
But it is the third element, the result, that requires a deeper analysis. Assuming that it was clear from the letter that the defendant was then incarcerated, was the District Attorney reasonable in his fear or expectation that the threatened conduct was imminent?
Despite the fact that the defendant was then incarcerated, a fact readily apparent from the return address as stated in his letter, it is nevertheless fairly inferred that he is threatening to cause to be murdered the various individuals that he names. Therefore, the District Attorney would have had cause to be concerned about the actions of any number of unknown persons acting in support of the defendant.
In its more common usage, “imminent” means that the danger is immediately present. Here, however, Penal Law § 490.20 (2) specifically provides that it is no defense to the charge that the defendant was not actually capable of making good on the threat or that the threat was made to someone other than the intended victim. Thus, the statute allows for an interval of time and space between the utterance of the threat and the communication of that threat to the victim. Necessarily, the threat need not be “imminent” in the strict sense, but such that the victim reasonably perceived himself or herself to be in real danger that the threatened conduct could be carried out anywhere, anytime without warning. See, for example, People v Thompson (72 NY2d 410 [1988]), where one inmate was convicted of sodomy in the first degree (forcible compulsion— placing the victim in fear of immediate death or physical injury) by threatening the victim, a fellow inmate, with substantial harm if he did not submit, notwithstanding that the defendant and the victim were housed in separate parts of the jail and that they were separated by bars and a locked gate at the time of the threat. “That the defendant was not specific about when the threats might be carried out is of little consequence. The breadth of his threats encompassed the possibility that the harm could be delivered by anyone, including those with immediate access to the victim, and at anytime, including the present.” (Id. at 417.)
Given the words and tone of the letter, and taking into consideration all of the surrounding circumstances, there was *229 sufficient proof presented that would allow the grand jury to conclude that the District Attorney was reasonable in his fear or expectation that the threatened murders might be imminent.
The day after the threat was received, Investigator Nell interviewed the defendant in the Public Safety Building in Syracuse. He asked the defendant if he had any particular message he wanted to communicate to the persons named in his letter, and the defendant allegedly replied, “Tell them to take me serious [sic] . . . Tell them they should be scared. I won’t be in here forever. When I get out, it’s going to start. And tell Mr. Cerio the last day of October is his last.” This later statement would seem to imply that the defendant was not going to rely on others to carry out the threats for him, and that the murders would not start until after he was released from jail. Had this been contained in the defendant’s letter, it might have cast doubt on whether the District Attorney could reasonably conclude that the murders were imminent. Yet, the statute is addressed to the victim’s reaction at the time that the threat is communicated to him, not a substantial period of time later when the defendant has had the opportunity to qualify the threat.
The grand jury was properly instructed on the law. There were no errors or irregularities that would render the grand jury’s proceedings “defective” within the meaning of Criminal Procedure Law § 210.35 (5).
Accordingly, the defendant’s motion to dismiss or reduce the charges contained in the indictment is denied.

 The letter indicates that it is “From James Van Patten, 97-2139,” followed by the street address of the Public Safety Building in the City of Syracuse.