■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DONALD JENNER, Appellant. [835 NYS2d 501]—

Kane, J. Appeal from a judgment of the County Court of Madison County (McDermott, J.), rendered March 14, 2005, upon a verdict convicting defendant of the crime of making a terroristic threat.

Defendant and his girlfriend resided in the City of Syracuse, Onondaga County. Prior to their cohabitation, the girlfriend's son was removed from her care and placed in the custody of the Department of Social Services (hereinafter DSS) of Madison County. Madison DSS employee Robin Streeter was the primary caseworker assigned to the girlfriend's case. Tim Brown was Streeter's supervisor. When the girlfriend moved to Onondaga County, Michelle Moon, an employee with DSS of Onondaga County, was assigned as a secondary caseworker. The ultimate goal of DSS was reunification of the girlfriend with her son. After learning that defendant had a criminal record, including a conviction for a sexual offense, Moon repeatedly advised defendant and his girlfriend of DSS's policy that a child not be permitted to have any contact, other than supervised visitation, with an untreated sex offender. Defendant never provided DSS with proof that he had completed a sex offender treatment program. As a result, Moon told defendant and his girlfriend that reunification with her son would not be possible as long as she continued to reside with defendant, unless he provided proof of completion of an approved treatment program.

At a May 3, 2004 unannounced home visit, Moon again informed the girlfriend of the DSS policy noted above. Defendant, who was entering the apartment and overheard Moon, became irate. He began yelling and cursing at Moon, stating "I'm sick of Madison and Onondaga County telling me what to do." Pointing at Moon, he continued, "I'll solve this problem. I'll walk right into Madison County DSS. I'll get a gun. And I'll take care of that f***ing b**** Robin Streeter and Tim Brown once and for all, and I'm not kidding. I've got nothing . . . you

think Columbine was something, I've got nothing to lose." In previous conversations, defendant had told Moon that he had been diagnosed with end stage liver disease and hepatitis C and had only months to live. Defendant mentioned numbers and letters commonly associated with gun models, such as AK 47, stated that he was a member of a militant Native American society and said, "I can get my hands on any kind of gun that I need at any time." He also directed epithets at Streeter. Upon leaving the apartment, Moon notified Streeter of defendant's threats. Streeter notified Brown and the police.

Defendant attempted to call the Onondaga County District Attorney while Moon was present, but he had to leave a message. On May 4, 2004, an investigator from the District Attorney's office returned the call. Defendant stated that he was upset with caseworkers from Madison and Onondaga DSS, specifically identifying Streeter and Moon. He indicated that he would carry through with his intentions from the previous day, although he would not repeat those intentions over the phone.

A Madison County grand jury handed up an indictment charging defendant with two counts of making a terroristic threat (*see* Penal Law § 490.20 [1]), the first count relating to his statements to Moon on May 3, 2004 and the second count relating to his statements to the investigator on May 4, 2004. After trial, the jury acquitted defendant of the second count, but found him guilty of the first count. Defendant appeals.

As relevant here, "[a] person is guilty of making a terroristic threat when with intent to . . . influence the policy of a unit of government by intimidation or coercion, or affect the conduct of a unit of government by murder, assassination or kidnapping, he or she threatens to commit or cause to be committed a specified offense and thereby causes a reasonable expectation or fear of the imminent commission of such offense" (Penal Law § 490.20 [1]). By not moving in County Court to dismiss the indictment on the ground that Penal Law § 490.20 is unconstitutional as applied, defendant failed to preserve that argument for our review (*see People v Riddick*, 34 AD3d 923, 925 [2006]). Were we to consider this argument, we would find that defendant failed to overcome the strong presumption that this legislative enactment is valid (*see People v Stuart*, 100 NY2d 412, 422 [2003]). Penal Law § 490.20 survives the test for constitutional vagueness because the statutory language sufficiently apprises persons of ordinary intelligence of the type of conduct that is forbidden and provides law enforcement officials with clear standards for enforcement (*see id.* at 420-421 [2003]; *People v Riddick, supra* at 925). Indeed, defendant acknowledges that

his conduct was illegal but simply makes the assertion, irrelevant to his constitutional argument, that his conduct was not what the Legislature had in mind when it enacted this statute after the terroristic attacks of September 11, 2001 and he should not be labeled a terrorist. Regardless of the Legislature's intent, the plain words of Penal Law § 490.20 clearly inform the public and law enforcement officials of the conduct forbidden by the statute.

Contrary to defendant's contentions, the testimony of Moon, Streeter, Brown, the investigator and other witnesses sufficiently established that defendant threatened to kill DSS employees, this threat was intended to intimidate or coerce public employees to influence DSS's policy regarding contact between children and sex offenders, defendant intended through such a murder to interfere with DSS's conduct of enforcing this policy, and his words and conduct caused reasonable fear of the imminent commission of such a murder. The statute specifically eliminates as defenses the lack of intent or capability of committing the murders, and that the threat was made to someone other than a person subject to the threat (*see* Penal Law § 490.20 [2]). As the prosecution's witnesses established each element of the offense, the evidence was legally sufficient to support defendant's conviction.

Regarding defendant's argument that the indictment lacked sufficient precision and thereby deprived him of the opportunity to prepare an adequate defense, we find the indictment sufficient under CPL 200.50. Defendant could have sought more factual details through a demand for bill of particulars and, in any event, it appears that defendant was sufficiently aware of the basis for the charges and prepared a defense accordingly.

County Court did not abuse its discretion in denying defendant's motion for dismissal in the interest of justice. Such a dismissal is permissive rather than mandatory (*see* CPL 210.20 [1] [i]; 210.40 [1]), and courts should exercise their discretion in this regard sparingly, only in situations where there are compelling reasons (*see People v Kennard*, 266 AD2d 718, 719 [1999], *lv denied* 94 NY2d 864 [1999]; *People v Litman*, 99 AD2d 573, 574 [1984]). Despite defendant's poor health and his argument that his actions did not fit the typical definition of terrorism so as to subject him to these charges, no injustice was likely to result from prosecuting him for threatening the lives of public servants (*compare People v Tavares*, 273 AD2d 707, 707-708 [2000], *lv denied* 95 NY2d 939 [2000]). Additionally, the court was not required to hold a hearing prior to denying this motion (*see id.* at 708).

Having failed to request that the District Attorney be disqualified or recused from prosecuting this case, that contention is unpreserved. In any event, we see no basis upon which such a request would have been granted (*see People v Gigliuto*, 22 AD3d 890, 891-892 [2005], *lv denied* 7 NY3d 789 [2006]).

Defendant's only grounds for alleging that counsel was ineffective are that counsel failed to move for the District Attorney's disqualification or recusal and that counsel sought to be relieved prior to the sentencing hearing. As noted above, there was no basis for the prosecutor's removal; counsel is not ineffective for failing to make a baseless motion (*see People v Love*, 307 AD2d 528, 532-533 [2003], *lv denied* 100 NY2d 643 [2003]). While counsel had a potential conflict of interest at the sentencing hearing because the People intended to call a witness who counsel had previously represented, that conflict disappeared when the People informed the court that they would not call the witness. Defendant was not prejudiced by the potential conflict and, in fact, may have benefitted because the witness did not testify against him. Under the overall circumstances of this case, including defendant's acquittal of one count, counsel provided defendant with meaningful representation (*see People v De Marco*, 33 AD3d 1045, 1046 [2006]).

Defendant was not deprived of a fair trial due to County Court's order that he be restrained during the trial. Defendants should not be physically restrained in front of the jury unless a reasonable basis for such restraint is articulated on the record (*see People v Rouse*, 79 NY2d 934, 935 [1992]; *People v Mendola*, 2 NY2d 270, 275-276 [1957]; *People v Allaway*, 13 AD3d 715, 716 [2004]). Here, the court ordered that defendant be restrained by leg shackles at all times and wear handcuffs whenever he left the defense table. Although not articulated on the record earlier in the proceedings, at argument on defendant's posttrial motion, the court stated that it would again explain its reasons for the restraint order. Among the reasons were defendant's criminal history, which included an assault conviction, the serious nature of the pending charges, the small size of the room and the proximity of numerous other people, several witnesses who would be testifying were persons who defendant had threatened, and defendant had previously stated that he was dying and had nothing to live for, causing the court to believe that he was willing to risk anything, even his own personal safety, to further his goals.

County Court took measures to reduce any prejudice to defendant. It noted that the leg shackles were likely not visible as defendant was seated at the table farthest from the jury and he

was present at the table before the jury arrived in the courtroom. When defendant testified, he was seated on the witness stand before the jury was let in, the entire courtroom was directed not to stand at that time, a wooden panel in front of the witness stand covered his hands unless he raised them and the court did not notice him ever raising his hands to the point where his handcuffs were visible. Although the jury could see defendant's restraints when he approached the bench for conferences and when he attended jury voir dire with individual jurors conducted in a small room off the courtroom, the court instructed the jury three separate times that the use of restraints was an ordinary security measure and could not be used as any indication of guilt (*see People v Allaway, supra* at 716). As the court articulated reasons for requiring the restraints and took efforts to avoid any prejudice to defendant, the order requiring that he wear restraints did not deprive defendant of a fair trial (*compare People v Neu*, 124 AD2d 885 [1986]).

Finally, we will not disturb defendant's sentence. Defendant's criminal history fit him within the definition of a persistent felony offender (*see* Penal Law § 70.10 [1]). After considering all the evidence presented at a sentencing hearing, County Court reasonably determined that defendant's history and character, along with the nature and circumstances of his criminal conduct, indicated that lengthy incarceration and lifetime supervision would best serve the public interest (*see* Penal Law § 70.10 [2]). Having made that determination, the court imposed a sentence of 15 years to life imprisonment, the minimum permissible sentence for a persistent felony offender (*see* Penal Law § 70.00 [2] [a]; [3] [a] [i]). This sentence was not harsh or excessive under the circumstances.

Mercure, J.P., Peters and Mugglin, JJ., concur. Ordered that the judgment is affirmed.