OPINION
OF THE COURT
Donald F. Cerio, Jr., J.
This matter comes on before the court upon plaintiffs notice of motion for summary judgment dated October 28, 2011, seeking a declaration of this court that defendant Town of Middle-field’s zoning law pertaining to gas, oil, or solution drilling or mining and the ban on gas, oil or solution drilling or mining within the Town of Middlefield is void as being preempted by New York State Environmental Conservation Law § 23-0303. Defendant submitted a notice of cross motion dated December 5, 2011, opposing the relief requested by plaintiff and seeking dismissal of plaintiffs complaint.
On December 13, 2011, the parties, including counsel on behalf of amici, appeared in Madison County Supreme Court and were heard.
By decision and order of this court dated January 11, 2012, amici curiae application of EARTHJUSTICE, on behalf of Brewery Ommegang; Village of Cooperstown; Otsego 2000, Inc.; Natural Resources Defense Council, Inc.; Theodore Gordon Fly-fishers, Inc.; Riverkeeper, Inc., and; Catskill Mountainkeeper, and that of the Town of Ulysses, were granted.
Supplemental submissions by and on behalf of plaintiff, defendant and EARTHJUSTICE were subsequently received by this court on or about January 20, 2012, in conformity with this court’s earlier directive with respect thereto.
The following reflects the decision and order of this court:
Brief History
The Town of Middlefield, Otsego County, New York, enacted a zoning law on June 14, 2011, which became effective on June 28, 2011, entitled “A Local Law Repealing the Town of Middle-field Zoning Ordinance and Adopting the Town of Middlefield Zoning Law.” (Defendant’s notice of cross motion, exhibit 1.) Article V of the Town of Middlefield Zoning Law entitled “General Regulations Applying to All Districts” and, in particular, section A entitled “Prohibited Uses,” as is relevant here, specifically states that “[h]eavy industry and all oil, gas or solution *721 mining and drilling are prohibited uses.” Zoning Law article II, section B (7) and (8) define the terms “Heavy Industry” and “Gas, Oil, or Solution Drilling or Mining,” as are relevant here, as follows:
“7. Gas, Oil, or Solution Drilling or Mining: The process of exploration and drilling through wells or subsurface excavations for oil or gas, and extraction, production, transportation, purchase, processing, and storage of oil or gas, including, but not limited to the following:
“i. A new well and the surrounding well site, built and operated to produce oil or gas, including auxiliary equipment required for production (separators, dehydrators, pumping units, tank batteries, tanks, metering stations, and other related equipment;
“ii. Any equipment involved in the re-working of an existing well;
“iii. A water or fluid injection station(s) including associated facilities;
“iv. A storage or construction staging yard associated with an oil or gas facility;
“v. Gas pipes, water lines, or other gathering systems and components including but not limited to drip station, vent station, chemical injection station, valve boxes.
“8. Heavy Industry: a use characteristically employing some of, but not limited to the following: smokestacks, tanks, distillation or reaction columns, chemical processing or storage equipment, scrubbing towers, waste-treatment or storage lagoons, reserve pits, derricks or rigs, whether temporary or permanent. Heavy industry has the potential for large-scale environmental pollution when equipment malfunction or human error occurs. Examples of heavy industry include, but are not limited to: chemical manufacturing, drilling of oil and gas wells, oil refineries, natural gas processing plants and compressor stations, petroleum and coal processing, coal mining, steel manufacturing.”
Therefore, it is evident that defendant has, by the enactment of the June 2011 zoning law, effectively banned oil and gas drilling within the geographical borders of the township.
Plaintiff had previously executed two oil and gas leases with Elexco Land Services, Inc., on February 22, 2007, and March 8, *722 2007, with respect to property owned by plaintiff situated in the Town of Middlefield, Otsego County, New York. Plaintiff has asserted that the purpose of such leases will be frustrated by the enforcement of the above-referenced zoning law as enacted in June 2011 by the defendant and seeks to declare such law void. (Huntington affidavit, dated Oct. 26, 2011, HH 6-11.)
Plaintiff seeks relief upon the ground that New York State Environmental Conservation Law § 23-0303 (2) preempts any regulations emanating from local authorities with respect to the regulation of gas, oil and solution drilling or mining, and that defendant’s zoning law is thereby preempted by exclusive state jurisdiction. The defendant, on the other hand, asserts that no preemption has occurred by operation of ECL 23-0303 (2), that the Town of Middlefield’s zoning law is valid and that oil and gas drilling is prohibited within the township pursuant to law.
Plaintiffs reliance upon ECL 23-0303 (2) is premised upon the supersession language contained within the statute itself. This particular subdivision, as enacted in 1981 (L 1981, ch 846), reads as follows: “The provisions of this article shall supersede all local laws or ordinances relating to the regulation of the oil, gas and solution mining industries-, but shall not supersede local government jurisdiction over local roads or the rights of local governments under the real property tax law.” (Emphasis added.)
Thus, the plain language of the zoning law as enacted by defendant and the above-referenced provision of the Environmental Conservation Law frame the question of law to be addressed by this court. Specifically, did the State of New York, by the enactment of ECL 23-0303 (2), prohibit local municipalities from enacting legislation which may impact upon the oil, gas and solution drilling or mining industries other than that pertaining to local roads and the municipalities’ rights under the Real Property Tax Law? This court finds the answer to this question to be in the negative.
Legal Analysis
In assessing the interplay between local regulation and the extent of state preemption as contained within ECL 23-0303 (2) this court must look to the legislative intent and the legislative history of the particular enactment to discern the scope of such preemption. With respect to preemption the first issue to be addressed is the identification of the manner by which preemption is manifested, if at all, by the statutory language employed by *723 the enabling legislation. More precisely, is preemption manifested by express or implied statutory language or, rather, by operation of conflict preemption. Here, it is clear to this court that the Legislature chose to expressly address preemption within the body of the statute itself. The question which next arises, then, is to what extent does preemption apply.
In considering this question this court has examined the legislative history of, first, article 3-A of the former Conservation Law and, second, the successor provisions of article 23 of the Environmental Conservation Law. Such an examination of the legislative history is both appropriate and necessary in determining what the intent of the legislation was at the time of the enactment of ECL 23-0303 (2), nearly 20 years after the enactment of the original legislation in 1963, as well as what the “natural and most obvious sense” of the language means. (See McKinney’s Cons Laws of NY, Book 1, Statutes § 94.)
1963 Legislation
The policy of the state, at the time of original enactment of article 3-A of the Conservation Law in 1963, was set forth in the enacted legislation as follows:
“§ 70. Declaration of policy. It is hereby declared to be in the public interest to foster, encourage and promote the development, production and utilization of natural resources of oil and gas in this state in such a manner as will prevent waste; to authorize and to provide for the operation and development of oil and gas properties in such a manner that a greater ultimate recovery of oil and gas may be had, and that the correlative rights of all owners and the rights of all persons including landowners and the general public may be fully protected, and to provide in similar fashion for the underground storage of gas.” (L 1963, ch 959, § 1.)
The term “waste” as set forth in section 70 was defined in section 71 (1) as follows:
“ ‘Waste’ means (a) physical waste, as that term is generally understood in the oil and gas industry, (b) the inefficient, excessive or improper use of, or the unnecessary dissipation of reservoir energy, (c) the locating, spacing, drilling, equipping, operating, or producing of any oil or gas well or wells in a manner which causes or tends to cause reduction in the quantity of oil or gas ultimately recoverable from a *724 pool under prudent and proper operations, or which causes or tends to cause unnecessary or excessive surface loss or destruction of oil or gas, (d) the inefficient storing of oil or gas, and (e) the flaring of gas produced from an oil or condensate well after the conservation department has found that the utilization thereof, on terms that are just and reasonable, is, or will be within a reasonable time, economically feasible.” (Id.)
The thrust of the above provisions of article 3-A of the Conservation Law have remained, in effect, unchanged throughout the years and are presently found at ECL 23-0301 and 23-0101 (20), respectively.
The ensuing provisions of article 3-A, as enacted in 1963, fail to specifically address therein any land use issues which would otherwise be the subject of a local municipality’s zoning authority as an exercise of its police powers. This court’s review of this legislation finds that the various provisions of article 3-A focused the Conservation Department’s efforts on matters such as spacing units, integration of oil and gas pools and fields, oil and gas leases as well as the plugging of old wells, which are all regulatory in nature.
Of the various documents comprising the legislative history of the 1963 enactments, as submitted to this court by counsel, is the April 15, 1963 memorandum from the Conservation Commissioner in support of this legislation. This legislation would make the Conservation Department “responsible for the administration of oil and gas operations in the state” and, in particular, the “regulation thereof on public and private lands.” (Bill Jacket, L 1963, ch 959, at 20.) The April 23, 1963 Report to the Governor on Legislation from the Department of Audit and Control, while taking no position with respect to passage of the legislation, noted in the summary that the legislation would pertain to “the conservation of oil and gas . . . with the regulation of oil and gas on both public and private lands.” (Id. at 17.) The summary further noted that “[t]he bill prohibits waste of oil or gas, very broadly defining the term ‘waste.’ Notice to the department is required prior to commencing drilling or storage at existing fields” and, under certain circumstances, the need for a permit. (Id.) The summary also addressed the department’s powers pertaining to “regulation, investigation and supervision. Additional regulatory provisions are granted with respect to new oil or natural gas pools or fields.” (Id.) This correspon *725 dence identifies both the state’s declared policy and the permitting process and regulations pertaining to extraction of gas and oil.
Of further importance to this court’s interpretation is the “Memorandum in Support” of the original 1963 legislation, authored by Edgar S. Nelson, Executive Director, New York State Petroleum Council, dated April 24, 1963. Mr. Nelson, while addressing the industry’s efforts to prepare a “comprehensive geological and geophysical study of [New York State] lands, particularly the deeper horizons” with respect to oil and gas drilling (id. at 56), expressed his support for the legislation as such would provide the Conservation Department
“regulatory powers pertaining to the determination and establishment of proper well spacing units and well locations, regulation of the drilling and plugging of wells, furnishing of well drilling information to the department, approval of voluntary and/or compulsory integration and utilization in new oil and gas pools and fields, under prescribed conditions . . .
“The Department is empowered to make an early determination as to all the lands believed underlaid by a pool and shall fix the proper size drilling units and well locations. This uniform distribution of wells will permit a sooner definition of the limits and characteristics of the pool or field. It will also permit the Department to determine earlier the proper method of operation. In addition, the earlier widespread development of an entire pool permits all owners to share in the production from the pool at an earlier date and will bring about a more equitable distribution of oil and gas” (id. at 56-58).
Mr. Nelson’s support of the legislation was premised upon the state’s oversight of the industry’s activities based upon geologic and geophysical assessments of the subsurface existence of oil and gas pools and fields so as to maximize utilization of these natural resources and to prevent waste from the inefficient and ineffective installation of wells impacting such pools or fields. The thrust was to establish a statewide management system for the utilization of these resources so as to encourage oil and gas drilling in the state in a uniform and productive fashion.
The posture of Mr. Nelson was consistent with that of H. Ames Richards, Jr., vice-president of Felmont Oil Corporation, evidenced in his letter dated January 18, 1963, to Senator *726 Elisha T. Barrett. The attached draft legislative brief recognized that much of the proposed New York State legislation was similar to the recommendations made by the Interstate Oil Compact Commission, of which New York State was a member. Of significance to this court was Mr. Richards’ recognition that such proposed legislation would “authorize the Conservation Department to provide for orderly drilling in new fields in accordance with sound geological and engineering principles. To this end, the department is authorized to establish well spacing units of a size and shape that can be economically and efficiently drained by one well.” (Id. at 8.) Such expression serves to confirm the state’s interest in developing this particular resource utilizing “sound geological and engineering principles” and “orderly drilling in new fields” thus addressing the manner and method by which such drilling should occur so as to avoid wasting these natural resources. (Id.)
1978 Legislation
The 1978 amendments to article 23, and in particular section 23-0301 thereof, replaced the phrase “foster, encourage and promote” as contained in the original 1963 version with the word “regulate.” This same legislation also amended Energy Law § 3-101 (5) to
“foster, encourage and promote the prudent development and wise use of all indigenous state energy resources including, but not limited to, on-shore oil and natural gas, off-shore oil and natural gas, natural gas from Devonian shale formations, small head hydro, wood, solar, wind, solid waste, energy from biomass, fuel cells and cogeneration,” thus statutorily and departmentally dividing these two disparate responsibilities.
These amendments effectively transferred the promotion of energy to the Energy Office while concomitantly continuing regulation of the oil, gas and solution mining industry with the Department of Environmental Conservation.
The historical commentary coexistent with the amendments demonstrates the legislative intent to permit the state to “conduct a coordinated long range campaign for developing the State’s indigenous State resources and to insure effective regulation of gas and oil development and production.” (Budget Report on Bills, Bill Jacket, L 1978, ch 396 [as provided by Senator Martin S. Auer to Counsel to the Governor, Honorable Judah Gribetz, with a letter dated June 7, 1978].) Another enclosure *727 of Senator Auer’s June 7, 1978 correspondence was from the Energy Office which, in recommending approval of the legislation, stated that
‘ [r] esponsibility for promoting energy resource development in New York State is shared by many agencies, including DEC which also has regulatory responsibilities over those same resources. Necessary development activities have proceeded in a haphazard fashion, if at all. The development of potentially significant and economic state energy resources — Lake Erie natural gas; on-shore oil and gas; Atlantic natural gas and oil; natural gas from Devonian shale formations; small head hydro; wood; solar; wind; solid waste; energy from biomass; co-generation — would benefit from a focused approach given a high priority by State government.
“Further, a centralized development function would aid the State in joining federal, regional and local interests in joint development efforts.” (James L. Larocca, Commissioner, Energy Office Report on Bills, June 8, 1978, at 1, Bill Jacket, L 1978, ch 846 [emphasis added].)
Thus, the amendment recognized the need to centralize promotion of the state’s energy resources under the authority of a single administrative body, i.e., the Energy Office, while streamlining the regulatory function of the Department of Environmental Conservation. However, no reference was made in the legislation itself, or any correspondence in support of the legislation, pertaining to the impact or preemption by the state of local municipal land use management nor had such reference been made since the enactment of the original legislation in 1963.
1981 Legislation
In 1981 the State of New York amended various provisions of the State Finance Law, the Environmental Conservation Law, the Real Property Tax Law, the Agriculture and Markets Law and the Tax Law. The legislative memorandum supporting the act (S6455-B/A8475-B) states, in relevant part, that the purpose of the amendment is:
“[I]n relation to promoting the development of oil and gas resources in New York and regulating the activity of the industry, repealing provisions of the environmental conservation law relating thereto and *728 making appropriations to the department of environmental conservation and the state board of equalization and assessment for carrying out certain provisions of this act.
“PURPOSE OF THE BTLL:
“To promote the growth, development and proper regulation of oil and natural gas resources in New York State by:
“a) establishing new fees to fund additional regulatory personnel for the industry and to provide a fund to pay for past and future problems which resulted by the industry’s activities.
“b) establish a uniform method of real property taxation for oil and natural gas lands.
“c) clarify the impact of oil and natural gas development for farmers who have committed their lands to Agricultural District Treatment.
“d) create an advisory board to advise Commissioner on oil and natural gas matters. . . .
“JUSTIFICATION:
“Due to the energy crisis, the Governor and Legislature have made it clear that it is important to promote the development of domestic energy supplied, including NYS’s resources of oil and natural gas. The recent growth of drilling in the State has exceeded the capacity of DEC to effectively regulate and service the industry. The industry will benefit from the expeditious handling of permits and improved regulation and it is therefore equitable that the industry provide increased support for the services it requires.” (Mem at 1-2, Bill Jacket, L 1981, ch 846 [emphasis added].)
It was at this point in the history of this legislation that the supersession clause as contained within ECL 23-0303 (2) was enacted. As is evident from a reading of the legislative memorandum which acknowledged that promotion and regulation were considered separate and distinct activities (divided between the Energy Office and the Department of Environmental Conservation), the regulation component itself, as set forth in ECL 23-0303 (2), specifically dealt with the activity of the industry, i.e., method and manner of drilling and the like, rather than the broader component of the development of this natural resource.
*729 The Governor’s approval of the aforesaid act, as set forth in his Approval Memorandum, confirms that the amendment would provide Department of Environmental Conservation with funding for its “expanded regulatory program” as well as enhanced civil and criminal penalties. (Governor’s Approval Mem at 1, Bill Jacket, L 1981, ch 846.) The memorandum then addressed the “possible adverse environmental impact of oil and gas development” and the fund’s ability to address such issues as “the abatement of dangerous oil and gas-related accidents.” (Id.) There is no language contained within the legislative history which serves to support plaintiffs claim that the supersession clause enacted was intended to impact, let alone diminish or eliminate, a local municipality’s right to enact legislation pertaining to land use.
Therefore, this court finds no support within the legislative history leading up to and including the 1981 amendment of the ECL as it relates to the supersession clause which would support plaintiffs position in this action. Neither the plain reading of the statutory language nor the history of ECL 23-0303 (2) would lead this court to conclude that the phrase “this article shall supersede all local laws or ordinances relating to the regulation of the oil, gas and solution mining industries” was intended by the Legislature to abrogate the constitutional and statutory authority vested in local municipalities to enact legislation affecting land use. (NY Const, art IX, § 2 [c] [ii] [10]; Municipal Home Rule Law § 10 [1] [ii] [a]; § 11; Statute of Local Governments § 10 [6], [7]; Town Law § 261.) Rather, the “natural and most obvious sense” of the word “regulation” in this statute, taken in conjunction with the legislative history of this body of law as well as its definition as “an authoritative rule dealing with details or procedure” (Merriam-Webster Dictionary), convincingly demonstrates that the Legislature’s intention was to insure statewide standards to be enacted by the Department of Environmental Conservation as they relate to the manner and method to be employed with respect to oil, gas and solution drilling or mining, and to insure proper statewide oversight of uniformity with a view towards maximizing utilization of this particular resource while minimizing waste. Clearly, the state’s interests may be harmonized with the home rule of local municipalities in their determination of where oil, gas and solution drilling or mining may occur. The state maintains *730 control over the “how” of such procedures while the municipalities maintain control over the “where” of such exploration.[1]
Further, decisional law of this state also supports the finding that municipalities are not preempted by ECL 23-0303 (2) from enacting local zoning ordinances which may, and in some circumstances such as the instant zoning law do, prohibit oil, gas and solution drilling or mining. In Matter of Frew Run Gravel Prods. v Town of Carroll (71 NY2d 126 [1987]) the Court of Appeals, while addressing the breadth of the supersession clause of the Mined Land Reclamation Law (MLRL) (ECL 23-2703 [2]), found that the zoning regulations of the Town of Carroll did not frustrate the state’s “purposes of the statute ... ‘to foster a healthy, growing mining industry’ and ‘aid in assuring that land damaged by mining operations is restored to a reasonably useful and attractive condition.’ ” (Id. at 132.) The Court of Appeals found that the supersession clause contained therein (which is strikingly similar to that contained in ECL 23-0303 [2]) preempted the local municipality from establishing regulations pertaining to the methods of mining as such regulations were exclusively the province of the state while at the same time permitting the municipality, by exercise of its constitutional and statutory authority, to “regulate land use generally.” (Id. at 131.) Here, no less can be said about ECL 23-0303 (2) as the preemption does not apply to local regulations addressing land use which may, at most, “incidentally” impact upon the “activities” of the industry of oil, gas and solution drilling or mining.
The Court of Appeals decision in Matter of Gernatt Asphalt Prods. v Town of Sardinia (87 NY2d 668, 681-682 [1996]) confirmed the Frew Run holding that the supersession clause of the MLRL drew a distinction between the manner and method of mining and local land use regulations:
“Zoning ordinances, we noted, have the purpose of regulating land use generally. Notwithstanding the incidental effect of local land use laws upon the extractive mining industry, zoning ordinances are not the type of regulatory provision the Legislature foresaw as preempted by Mined Land Reclamation Law; the distinction is between ordinances that *731 regulate property uses and ordinances that regulate mining activities. In Frew Run, we concluded that nothing in the plain language, statutory scheme, or legislative purpose of the Mined Land Reclamation Law suggested that its reach ‘was intended to be broader than necessary to preempt conflicting regulations dealing with mining operations and reclamation of mined lands’ and that in the absence of a clear expression of legislative intent to preempt local control over land use, the statute could not be read as preempting local zoning authority.” (Citations omitted.)[2]
Similarly, here, the defendant’s zoning law is an exercise of the municipality’s constitutional and statutory authority to enact land use regulations even if such may have an incidental impact upon the oil, gas and solution drilling or mining industry. The zoning law does not conflict with the state’s interest in establishing uniform policies and procedures for the manner and method of the industry, nor does it impede implementation of the state’s declared policy with respect to these resources.
A review of the various provisions contained within article 23 of the Environmental Conservation Law pertaining to the Oil, Gas and Solution Mining Law (OGSML) clearly demonstrates the state’s interest in regulating the “activities,” i.e., the manner and method, of the industry. For example, ECL 23-0501 entitled “Well permits” requires a well permit to be issued to allow the applicant to “drill, deepen, plug back or convert a well for production of oil or gas.” (ECL 23-0501 [1] [b] [3].) This section also pertains to “Statewide spacing” for gas wells and sets forth a comprehensive listing of depths of drilling and sizes for various pools at various times. (ECL 23-0501 [1] [b] [1].) ECL 23-0503 entitled “Well spacing in oil and natural gas pools and fields” provides that a permit shall be issued by the Department of Environmental Conservation “if the proposed spacing unit . . . conforms to statewide spacing.” (ECL 23-0503 [2].) ECL 23-0901 addresses “[c]ompulsory integration and unitization in oil . . . and . . . natural gas pools and fields” which, as with the other examples set forth above, pertain to geologic and geophysical aspects of the activities or manner and method of oil, gas and solution drilling or mining. No specific or inferential *732 reference is made within these various provisions pertaining to land use legislation being preempted by these provisions. Therefore, as the Gernatt Asphalt Court found with respect to the MLRL supersession clause, the OGSML supersession clause preempts local regulation solely and exclusively as to the method and manner of oil, gas and solution mining or drilling, but does not preempt local land use control. Such distinct interests are easily harmonized as the local land use controls do not frustrate the state’s interest in regulating the method and manner of such industry activities and therefore do not interfere with the state’s declared policy as set forth at ECL 23-0301.
Therefore, it is evident that the supersession clause contained within ECL 23-0303 (2) does not serve to preempt a local municipality such as defendant from enacting land use regulation within the confines of its geographical jurisdiction and, as such, local municipalities are permitted to permit or prohibit oil, gas and solution mining or drilling in conformity with such constitutional and statutory authority.
Conclusion
Therefore, upon the facts and circumstances herein, and relevant statutory and decisional law of this state, it is ordered, that plaintiff’s motion for summary judgment declaring the Town of Middlefield Zoning Law as enacted on June 14, 2011, to be void is denied, and it is ordered, that defendant’s cross motion seeking to dismiss the plaintiffs complaint is granted.

. Plaintiffs submission of the post-enactment affidavit of Gregory H. Sovas, while anecdotally of interest, is not considered by this court with respect to the legislative intent of this body of law. (People v Morales, 86 AD3d 147 [1st Dept 2011], citing Civil Serv. Empls. Assn. v County of Oneida, 78 AD2d 1004 [4th Dept 1980], lv denied 53 NY2d 603 [1981].)

. Significantly, Gernatt Asphalt also stands for the proposition that a municipality may ban a particular activity, such as mining, in furtherance of its land use authority. (Id. at 683.)