■ The People of the State of New York, Respondent, v Dwight Brown, Appellant. [651 NYS2d 981]—Judgment, Supreme Court, New York County (Frederic Berman, J., at suppression hearing; Bonnie Wittner, J., at jury trial), rendered January 18, 1994, convicting defendant of attempted murder in the

second degree, and sentencing him to a term of from 6 to 18 years, is affirmed.

Testimony educed at the suppression hearing and at trial reveals that on December 21, 1992, defendant Dwight Brown approached Armando Alequin for the purpose of buying crack cocaine and, in exchange for the narcotics, offered Alequin his beeper. Alequin then allegedly sold the beeper to his friend for $60, but told defendant he had sold it for $40 and gave defendant $40 worth of crack. On December 23, 1992, defendant, having discovered he had been cheated, began an argument with Alequin, after which Alequin and his friends beat defendant up. Defendant left, vowing to return.

At approximately 6:00 P.M. on that same date, defendant returned to the area and shot Alequin in the face and groin from a distance of three feet in front of several witnesses. Alequin was rushed to St. Luke's Hospital, where he told Detective Wilfredo Morales that he knew his attacker, although he could not remember his name, but that he lived in Apartment 5C of a building which he described in sufficient detail to allow the police to determine its address.

Detectives Matos and his partner Detective Geis responded to the building and carefully checked out its layout and escape routes, although they did not go to Apartment 5C because they believed defendant to be "dangerous" and did not want to alert him to their presence. Lieutenant Pagan, the officers' supervisor, then contacted the New York City Police Department's Emergency Service Unit ("ESU"), which in turn dispatched a team of five officers.

At approximately 7:30 P.M., Detectives Matos and Geis proceeded to the rear of the building while Lieutenant Pagan and the five ESU officers knocked, or kicked, at the door of Apartment 5C. Defendant's live-in companion, Terranna Davis, acknowledged the knock through a closed door and was told it was the police and that they wanted to talk to her about a shooting that occurred down the block. Davis subsequently opened the door a few inches and said she knew nothing about a shooting.

ESU Officer O'Neill looked inside the apartment through the partially opened door and saw defendant walk across the living room, lift up a small child, and then cross back to the other side of the room. Lieutenant Pagan repeated that he wished to speak to Davis about a shooting, at which point she walked over to the defendant, leaving the door wide open. The police, construing this as an invitation to enter the apartment and continue the conversation, did so.

Davis, realizing the police had entered the apartment behind her, began screaming for the officers to leave and demanded to know if they had a warrant. Lieutenant Pagan requested that Davis calm down and, approximately 30 seconds after they had entered, he directed the visibly armed ESU officers to leave the apartment, to which they complied. Davis' testimony corroborates this.

Detective Matos then entered the apartment and saw Lieutenant Pagan talking to Davis and defendant, the latter of whom was holding a small child. In response to Davis' questions concerning the reason for the police presence, Detective Matos explained that there had been a shooting nearby and that witnesses had described defendant. Detective Matos then asked defendant if he would come to the precinct to clarify the situation. Defendant was not restrained, given his rights, questioned, or threatened in any manner. Defendant agreed and said "I'll get dressed", and later accompanied the officers to the precinct. Defendant was subsequently identified in a lineup at the precinct and was then arrested.

On July 23, 1993, after all parties had submitted written memoranda of law and completed their oral arguments at a suppression hearing, Justice Berman found that Davis opened the door to the apartment and then walked away from it, and while the police entry may have been somewhat unusual, it was proper. Justice Berman also found that no arrest was made of defendant in his home, that the police left the apartment when they were told to do so (a fact corroborated by Davis, the lone defense witness), and that defendant proceeded to the police station voluntarily with the police, despite the fact that Davis told him not to go. The hearing court found that defendant was not in custody or in any way restrained and that no force was used.

It is well-settled law that the fact findings of a suppression court are entitled to great deference and will not be disturbed unless clearly erroneous (*People v Prochilo*, 41 NY2d 759, 761; *People v Morales*, 210 AD2d 173, *lv denied* 84 NY2d 1035). It has also been held that consent to enter a home may be established by conduct, as well as words (*People v Satornino*, 153 AD2d 595; *People v Schof*, 136 AD2d 578, *lv denied* 71 NY2d 1033; *People v Davis*, 120 AD2d 606, *lv denied* 68 NY2d 769). In the matter at bar, while the police may not have received express permission to enter the premises, Davis' gesture of opening the door, leaving it wide open, and then walking away from it could certainly be interpreted by the police to consist of tacit approval for them to enter.

While we are aware that the ESU officers were heavily armed and wore various gear to protect themselves, it must be remembered that defendant was a suspect in a vicious, point-blank execution style shooting in front of a number of witnesses only an hour before, and the officers, who believed defendant was dangerous, were within their rights to protect themselves accordingly. We do not agree with the dissent that defendant was in custody and are unpersuaded by repeated referrals to machine guns (including make and model numbers, and barrel lengths), plans of attack and other military terminology as no one was "attacked", no one was shot, much less riddled by machine gun bullets, and the officers left when asked. In fact, no guns had been leveled at anyone at any time inside the apartment. The dissent, in placing undue emphasis on the different police gear and the "plan of attack", ignores the course of events which took place immediately after the police entry, and has, in effect, substituted its own conclusion based on selected facts over that of the suppression court, whose fact findings are entitled to great deference.

The evidence also supports the hearing court's finding that defendant was not in custody, or under arrest in the apartment and that he voluntarily agreed to leave with the officers. Once the officers ascertained that Davis wanted them out of the apartment and saw that defendant was with his family and posed no danger, they left the apartment immediately upon request.

It was Davis who began to curse and yell at the officers. At that point Officer Pagan apologized to the couple and explained to them the reason why they were there and the armed presence of the ESU officers. Officer Matos then stated that if defendant would agree to accompany him to the precinct, they would clarify the situation and, if he was not involved, they would drive him home. It is notable that Davis testified that she told defendant he did not have to go with the police, to which he replied, "Babe it's all right", and said "I'll go because, you know, just leave it at that". This further reinforces the court's finding that defendant was aware that he was under no obligation to accompany the officers and that he voluntarily left the apartment (*see, People v Nova*, 198 AD2d 193, *lv denied* 83 NY2d 808).

The facts presented amply support the findings of the hearing court, which concluded that the officers believed they had tacit approval to enter the apartment, that the police left when they were asked, that defendant was never placed in custody in the apartment, and that defendant voluntarily accompanied the police to the precinct.

Defendant's claims of improper conduct by the prosecutor were not preserved for review by objections on the grounds now stated (*People v Balls*, 69 NY2d 641), and we decline to review them in the interest of justice. Concur—Kupferman, Nardelli and Tom, JJ.

Rosenberger, J. P., and Mazzarelli, J., dissent in a memorandum by Mazzarelli, J., as follows: During the evening of December 23, 1992, police officers investigating a shooting, were directed to the appellant's address and apartment by complainant, a convicted drug dealer, and his friends. They described the shooter as a dark-skinned, medium-built man, 5 feet 8 or 9 inches tall, who wore an acid washed jean jacket and jeans. The motivation for the shooting attributed to the suspect by the complainant and his cohorts was that he was a disgruntled drug purchaser. Although unknown to the police at this time, defendant, who has no prior record and is an Army veteran, would later maintain that he was an anti-drug crusader who was being framed by the local drug traffickers.

Based on the information the police did have, a police officer on the scene requested the assistance of the Emergency Service Unit ("ESU"). After conducting reconnaissance by going to and checking the layout of appellant's building, the various officers regrouped to form "a plan of attack." Two officers safeguarded the building and the front door to the street was taped open to afford officers free access. Five members of the ESU and three detectives from the 24th Precinct went up to appellant's apartment on the fifth floor. The armed ESU officers were uniformed and helmeted, and were equipped with at least one 30 inch machine gun, a battering ram known as a "rabbit tool", a 40 inch by 24 inch bulletproof riot shield, and heavy flak jackets. Upon arriving on the landing, the officers tied a rope to the apartment door handle to enable them to immediately pull it shut in the event that someone with a weapon opened the door.

Police Officer Edward O'Neill, who was using both his hands to hold the machine gun, then kicked at the door. A woman, later learned to be Terranna Davis, asked who was there. O'Neill announced that it was the police and that they wanted to talk about a shooting down the block. Davis opened the door about two inches and responded that she knew nothing about the shooting. When the police insisted, Davis opened the door all the way.

A detective, who was standing in the hallway behind the Emergency Service Unit officers, then asked Davis, who was standing in the doorjamb, who she was. O'Neill then saw a

man, who was clad in his undergarments, walk across the living room to pick up a small child. As the woman turned to watch the man and child and then walked toward them, the entire team of officers followed Officer O'Neill into the apartment as he entered it. At no point did Davis or anyone else in the apartment invite the officers inside verbally or through non-verbal conduct, such as pointing or waving them in. Indeed, as Officer O'Neill acknowledged, Ms. Davis was visibly upset and yelled at the police to leave as they did not have a warrant.

O'Neill stood with his Heckler and Hoch MP5 machine gun at "port arms" across his chest. Officer Reyes stood with the "body bunker" and a semi-automatic pistol, and another officer continued to hold onto the rope attached to the door. Members of the team searched the apartment for other individuals, but found no individuals engaged in criminal activity and recovered no contraband. At the suppression hearing, O'Neill would later admit that he never asked for permission to enter and that he did not consider the team to be in hot pursuit of a suspect.

Eventually the ESU officers left the actual apartment, although O'Neill stood outside in the hallway with his machine gun. Detective Matos, one of the 24th Precinct detectives, remained inside and told appellant that he wanted him to come answer some questions about the shooting. Matos never told appellant he could refuse to come in for questioning, and followed him into the bedroom when appellant went to put on some clothes. As appellant dressed, Matos saw an acid washed jean jacket and requested appellant to wear it. Appellant complied. At the stationhouse, appellant was identified in a lineup and formally booked on charges of attempted murder.

"The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." (NY Const, art I, § 12; *see also*, US Const 4th, 14th Amends.) Notwithstanding intensified scrutiny in the media and elsewhere as to its continuing viability as means of regulating police conduct vis-à-vis members of the public, the exclusionary rule remains the principal mechanism for enforcing this limit on the State's power to intrude upon an individual's liberty (*but see*, *Brown v State of New York*, 89 NY2d 172 [constitutional tort implied in State Constitution's Bill of Rights for violation of right to be free from unreasonable searches and seizures]). Thus, when, as here, the authori-

ties have made a warrantless arrest of a suspect in his home, unless the police conduct was undertaken upon consent or in the face of exigent circumstances, the evidence which flows from therefrom cannot be used at trial (*Payton v New York*, 445 US 573; *People v Levan*, 62 NY2d 139). The analysis of the majority places great emphasis on the gravity and brazen nature of the crime being investigated. While we, as responsible members of the judiciary and bar, are deeply concerned for the safety of police personnel, this consideration alone cannot substitute for reasoned constitutional analysis. Traditionally, the gravity of a crime is but one in the constellation of factors to be evaluated when determining the reasonableness of police conduct, and whether exigent circumstances exist. Because, in my view, the motion to suppress evidence in this case should have been granted, I dissent.

In the case at bar, it is undisputed that the police made a warrantless entry into appellant's apartment. According the hearing court's factual findings the deference due them, the record does not support that court's conclusion, adopted by the majority, that appellant was not arrested or in custody inside the apartment and that, in any event, the initial warrantless entry was consensual or justified by exigent circumstances. To the contrary, the testimony of the People's own witnesses at the hearing failed to demonstrate the propriety of the police conduct in having a team of eight heavily armed and equipped officers barge into appellant's home, without a warrant, and arrest him.

The People argue that Ms. Davis consented to the warrantless entry and thus there was no *Payton* violation. However, it certainly cannot be said from a fair reading of the record that the People have established that the so-called consent to enter, implied by the majority from Ms. Davis having turned to walk back to her child in the living room, was "a true act of the will, 'an unequivocal product of an essentially free and unconstrained choice' " (*People v Richardson*, 229 AD2d 316, quoting *People v Gonzalez*, 39 NY2d 122, 128). In *Richardson*, we held, "the defendant's act of glancing over his shoulder at another man inside the apartment, which was apparently in response to the officer's inquiry if anything was wrong, and which the officer 'took * * * to mean' that he could enter the apartment, is insufficient to constitute an intentional waiver of a constitutional right. Since the officer never asked to enter the apartment, and no words were spoken, defendant's act of glancing over his shoulder cannot be construed as an invitation for the officer to enter." (*Supra,* at 316-317.)

The facts of the case at bar do not differ in such an appreciable manner from those in *Richardson* that a contrary result should obtain (*compare, e.g., People v Flores,* 181 AD2d 570 [welcoming hand gesture]; *People v Santornino,* 153 AD2d 595 [defendant's mother consents by telling police defendant is in his room and pointing to the room]; *People v DePace,* 127 AD2d 847, *lv denied* 69 NY2d 879 [defendant consents by handing over keys to car]). As the United States Supreme Court has made clear, a warrantless arrest in a person's home is *per se* unreasonable (*Mincey v Arizona,* 437 US 385, 393-394). To justify such conduct, the People bear the heavy burden of establishing at the suppression hearing that consent was given freely and voluntarily (*People v Gonzalez,* 39 NY2d 122, *supra*). This they did not do.

The People argue that after being told by the police that he was a suspect in the shooting, appellant voluntarily accompanied the police to the stationhouse and was not placed in custody and formally arrested until after he was identified in the lineup. However, while the hearing court's findings of fact with respect to custody are entitled to deference (*People v Morales,* 210 AD2d 173, *lv denied* 84 NY2d 1035), and there is of course "[n]o checklist * * * assembled that would facilitate mechanical determination of when a given set of circumstances equals an arrest" (*People v Hicks,* 68 NY2d 234, 239), it is well established that the subjective belief of neither the officer nor the citizen is the standard for measuring when a de facto arrest has occurred (*supra,* at 240). Rather, we must ask what "a reasonable [person], innocent of any crime, would have thought had he been in the defendant's position" (*People v Yukl,* 25 NY2d 585, 589). Measured by this standard, the People's argument in their brief that appellant welcomed "an opportunity * * * to exonerate himself by going to the precinct" and that this "decision to leave with the officers was entirely a product of his own free will" rings hollow. Viewed as a whole, the record makes plain that the defendant was, for all practical purposes, placed in police custody when the team of eight well-armed officers barged into his apartment, without a warrant, and found him unclothed in his living room (*see, Schneckloth v Bustamonte,* 412 US 218, 225-228; *People v Gonzalez, supra*).

The majority takes issue with so-called "repeated" references in this decision to the array of weaponry and armed personnel facing Ms. Davis at the time she opened the door. Pointedly, the majority does not dispute the accuracy of these descriptions, but rather employs dismissive, hyperbolic language to describe what did *not* happen inside the apart-

ment. This cannot pass for the requisite considered analysis, which calls upon us to apply the law to the facts of what did happen. The careful recitation of facts herein is an attempt to review the circumstances that existed at the critical moment when Ms. Davis opened the door. Ignoring the facts, or resorting to parody, does not, of course, change the essential facts, which are that the police, using "commando-like" tactics, made a warrantless entry into defendant's home without consent, and constructively arrested him.

Finally, although not directly addressed by the hearing court in its oral decision on the motion to suppress, or by the majority memorandum, the record does not support a finding that the warrantless entry in this case was justified by exigent circumstances. While the gravity and violent nature of the suspect's crime in this case give all pause, this is but one of the appropriate factors to be considered (*People v Williams*, 181 AD2d 474, *lv denied* 79 NY2d 1055). In making this determination, it must be borne in mind that even the People's own witness conceded that the officers were not in hot pursuit of a suspect, and that the entry occurred well over an hour after the shooting.

In short, the People failed to carry their burden of proof at the suppression hearing, and the appellant's motion should therefore have been granted. Accordingly, I would reverse and remand for a new trial.