People v Xochimitl (2018 NY Slip Op 06053)

People v Xochimitl

2018 NY Slip Op 06053 [32 NY3d 1026]

September 13, 2018

Court of Appeals

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, December 12, 2018

[*1]

The People of the State of New York, Respondent,
v
Omar Xochimitl, Appellant.

Decided September 13, 2018

People v Xochimitl, 147 AD3d 793, affirmed.

APPEARANCES OF COUNSEL

Paul Skip Laisure, Appellate Advocates, New York City (Dina Zloczower of counsel), for appellant.
Eriz Gonzalez, District Attorney, Brooklyn, (Michael L. Brenner of counsel), for respondent.
Make the Road New York, Brooklyn (Amy S. Taylor and Ariel Gould of counsel), and Legal Services NYC, New York City (Christine Clarke, Veronica Cook and Edward Josephson of counsel), for Make the Road New York and another, amici curiae.

{**32 NY3d at 1027} OPINION OF THE COURT

Memorandum.
The order of the Appellate Division should be affirmed. The determination as to whether police received voluntary consent to enter the apartment is a mixed question of law and fact (see People v McFarlane, 21 NY3d 1034, 1035 [2013]). "Although the voluntariness of the consent is open to dispute, our power to review affirmed findings of fact is limited. Since the finding of the trial court is supported by the record, we are precluded from upsetting it" (People v Morales, 42 NY2d 129, 138 [1977]; see McFarlane, 21 NY3d at 1035). As our concurring colleagues acknowledge, defendant did not contend below and does not contend on this appeal that his arrest was unlawful because the police went to his home with the intent of making a warrantless arrest.

Rivera, J. (concurring). For the reasons I have previously explained in People v Garvin, a home visit by law enforcement for the sole purpose of making a warrantless arrest which leads to the defendant's involuntary consent to the arrest, and is not justified by another exception to the warrant requirement, violates a defendant's constitutionally protected indelible right to counsel (30 NY3d 174, 205-210 [2017, Rivera, J., dissenting]; see also id. at 210-221 [Wilson, J., dissenting] [under Federal and State Constitutions, absent exigent circumstances, officers{**32 NY3d at 1028} planning to arrest a suspect at home must obtain a warrant]). This case illustrates why such warrantless visits undermine our constitutional mandates.
The officers went to defendant's home intending to make an arrest based on his having been deported twice and gained entrance to the apartment from defendant's elderly mother without first confirming that she understood English and their request to be allowed into her apartment to speak with her son. The arresting officer maintained that although he did not recall the mother uttering a single word, she "consented" when she "stepped away from the door" and they walked in. Even though a Spanish-speaking officer was present, he did not interact with the mother or anyone on the other side of the closed door before the officers walked past her towards defendant. While defendant was eventually arrested outside the home, this type of police interaction is intended to avoid the warrant requirement and undermines the protections guaranteed by our State Constitution (see Garvin, 30 NY3d at 206 [Rivera, J., dissenting] ["It would be the simplest of things for police to avoid the mandates of our Constitution and sidestep a defendant's indelible right to counsel by visiting a defendant solely to effectuate a house arrest without a warrant. Surely that is not what we intended when this Court recognized the broader protections afforded under our Constitution"]). In Judge Wilson's concurrence, he sets forth the facts in greater detail and the scenarios needlessly created by approaching someone's home without a warrant but intending to make an arrest (see Wilson, J., concurring op at 
1029-1031).
However, because defendant does not challenge his arrest on the ground that the police could not go to his home intending to make a warrantless arrest, the issue is not preserved. Therefore, I concur in the result because there is just barely enough record support on this mixed question of law and fact for the finding below that the police officers obtained consent to enter defendant's apartment (majority mem at 
1027).

Wilson, J. (concurring). In People v Garvin, we considered the validity of a warrantless arrest at a home when no exigent circumstances existed (30 NY3d 174 [2017]). Although I concur in the judgment here for the reason given by Judge Rivera, the factual disputes in this case illustrate why, absent exigent circumstances, we should require the police to obtain a warrant when they seek to arrest a person at home, as I set forth in my dissent in Garvin (id. at 210-221).{**32 NY3d at 1029}
Seven police officers, some clad in bulletproof vests, arrived at Mr. Xochimitl's residence at 6:00 a.m. Mr. Xochimitl resided there with his elderly mother and father, his sisters and his wife and children. The police believed Mr. Xochimitl was responsible for a homicide, but also knew he was a foreign national who had been twice deported and was not lawfully present in the United States. Thus, although the police were principally interested in Mr. Xochimitl as a homicide suspect, they intended to arrest him for illegal reentry at a minimum.
According to the officers present, they knocked on the door and announced themselves as police officers. An elderly woman opened the door. On direct examination, a detective testified that he asked the woman, in English, if the police could enter the home. In response, the woman backed away and "gestured" for them to enter. Upon cross-examination, however, the detective testified that he was "not exactly sure" if the woman gestured, but was sure she backed away, which he took to be an affirmative response to his request for permission to enter the home. The detective further testified that he did not know whether the woman understood English. Another detective testified that the first detective told him that the woman spoke only Spanish. Although two of the officers present spoke Spanish, they did not communicate with the woman.
According to Mr. Xochimitl's sister, who was in the home at the time, the officers entered immediately once the door was open, without asking for consent to enter. She also testified that she asked to see a warrant, and that the officers said, "[I]t's here," but never produced one.
"[A] search conducted without a warrant issued upon probable cause is 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions' " (Schneckloth v Bustamonte, 412 US 218, 219 [1973], quoting Katz v United States, 389 US 347, 357 [1967]). Consent is one of those exceptions, and "is a question of fact to be determined from the totality of all the circumstances" (id. at 227). Schneckloth and most cases detailing consent involve searches outside the home—automobiles, hand luggage, etc. Remember, however, that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed" (United States v United States Dist. Court for Eastern Dist. of Mich., 407 US 297, 313 [1972]). Do we really believe that the Fourth Amendment's drafters, fresh from experiences with British colonial rule, intended that taking a step or two back{**32 NY3d at 1030} when confronted by a warrantless, armed police presence at your doorstep would vitiate that Amendment's guarantees?[FN*] (More particularly, should we interpret New York's Constitution in that way?)
By importing the outside-the-home consent rules to non-exigent, warrantless home arrests, we are needlessly and painfully asking too much of everyone involved—the police, defendants, witnesses and the courts, with the result that we are making a loosely substantiated guess about whether the Fourth Amendment has been violated. I assume the detective here forthrightly testified that he could not remember a gesture other than a retreat, which he understood to be consent to entry, and that he did not know whether the elderly woman understood English. Examining the totality of the circumstances, however, requires much more. In the elderly woman's native country, what is customary when armed officers arrive at your doorstep? In gauging the meaning of her step(s) backwards, should we import to it the same meaning as if I stepped backwards when officers ask permission to enter my home? (See e.g. Richard W. Cole & Laura Maslow-Armand, The Role of Counsel and the Courts in Addressing Foreign Language and Cultural Barriers at Different Stages of a Criminal Proceeding, 19 W New Eng L Rev 193, 195 [1997] ["Some defendants, victims, or witnesses from different cultures may be misunderstood, or their actions, appearance, or demeanor misinterpreted by police, parties, jurors, or the court itself"]; Peter M. Tiersma & Lawrence M. Solan,[*2]Cops and Robbers: Selective Literalism in American Criminal Law, 38 L & Soc'y Rev 229, 241-242 [2004] ["when someone in a position of power 'asks' or 'requests' us to do something, it will normally be interpreted as a command. . . . If Mommy 'asks' Johnny whether he 'would like' to wash the dishes, Johnny had better roll up his sleeves"]). Should our interpretation of a "reasonable, good faith reliance by the police" (People v Adams, 53 NY2d 1, 8-9 [1981]) ignore cultural differences between the parties involved? (See e.g. United States v Gallego-Zapata, 630 F Supp 665 [D Mass 1986] [suppressing evidence in light of, inter alia, defendant's age, country of origin, education, and difficulty speaking and understanding English]).
When exigent circumstances are not present, requiring the police to obtain a warrant to arrest someone at home would{**32 NY3d at 1031} avoid our current guesstimation regime as to whether the Fourth Amendment has been violated. Here, for example, not only did the lower courts have to choose between two conflicting accounts of what happened when the police arrived, but even after choosing the police account, neither they nor we know whether the elderly woman gestured, what that gesture was or what she meant by it, how many step(s) back she took; whether she understood English; or whether she understood that she could refuse admission to the police. Instead, we are forcing officers, defendants and witnesses to do their best to recall very intricate details of an arrest—often many months after the event—and asking courts to reconcile those imperfect recollections. In truth, we do not know whether Mr. Xochimitl's Fourth Amendment rights were violated, because piecing together precisely what happened, so that we can determine what his mother's movement meant or whether an officer might reasonably believe she had consented, requires more precision than witnesses and courts can deliver.
The rule I offered in Garvin would better protect our constitutional rights and avoid the factual morasses police, witnesses and courts now face: "Absent exigent circumstances, officers planning to arrest a suspect at home must obtain a warrant" (Garvin, 30 NY3d at 210).
"The presence of a search warrant serves a high function. Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was done not to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals" (McDonald v United States, 335 US 451, 455-456 [1948]).
Chief Judge DiFiore and Judges Stein, Fahey, Garcia and Feinman concur. Judge Rivera concurs in result in a concurring opinion, in which Judge Wilson concurs in a separate concurring opinion, in which Judge Rivera concurs.
On review of submissions pursuant to section 500.11 of the Rules of the Court of Appeals (22 NYCRR 500.11), order affirmed, in a memorandum.

Footnotes

Footnote *:See generally Leonard W. Levy, Origins of the Fourth Amendment, 114 Pol Sci Q 79 (1999).