# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 84
The People &c.,
     Respondent,
    v.
Tramel Cuencas,
     Appellant.

Yvonne Shivers, for appellant.
Sholom J. Twersky, for respondent.
The Legal Aid Society, amicus curiae.

WILSON, Chief Judge:

Well before daybreak, four armed officers knocked repeatedly on the exterior door and window of a two-family residence. Someone responded by coming to the exterior door and opening it. The officers identified themselves as police, the person moved aside, and the officers entered the vestibule. Through the doorway of the downstairs apartment, they saw the person they wished to arrest, entered that apartment, and arrested him. The

- 1 -

question before us is whether the suppression court should have granted Mr. Cuencas's motion to suppress for lack of consent for police to enter the apartment. We hold that it was error to deny the motion and now reverse.

I.

Testimony adduced at the suppression hearing and trial established the following. On November 14, 2012, codefendants Tramel Cuencas and Irving Gavin abducted Thomas Dudley at gunpoint from his Brooklyn apartment, in the presence of Mr. Dudley's sisters, Monique and Brianna, and his cousin, Travis. They bound Mr. Dudley's hands with zip ties. He was found dead in a Queens park the next morning, with his throat and wrists cut. Some zip ties were next to his body.

On November 17, Monique and Travis reported Mr. Dudley's abduction to Queens detectives, showing a detective photos of the two abductors, stored on Monique's phone. A detective emailed the photos to detectives in the Brooklyn precinct; officers there recognized the men as Mr. Cuencas and Mr. Gavin. From a photo array, Monique and Travis subsequently identified them as the perpetrators. Detectives then issued "perp positive" I-cards[1] for the two men.

---

[1] "I-card" refers to "Investigation Card," a computerized notification used by the New York Police Department to alert patrol officers that an individual is wanted by the police. The I-card indicates the wanted individual as belonging to one of three categories: (1) "Perpetrator – Probable Cause to Arrest"; (2) "Suspect Only – No Probable Cause to Arrest"; (3) "Witness" (New York City Police Department Patrol Guide Procedure No. 208-23). Officers are instructed to detain, but not necessarily arrest, individuals named on I-cards who are designated "Perpetrator – Probable Cause to Arrest" (id.).

However, the police did not apply for a warrant to arrest Mr. Cuencas or Mr. Gavin. Instead, at 5:30 AM on November 19, a "warrant team" arrived at the residence where the police believed they could be found, a two-story, two-family house. The team was composed of four armed detectives, led by Detective Fogelman.

The detectives approached the front door of the building and knocked several times without response. An officer then knocked on a first-floor window. A man whom officers did not recognize looked out of the window and then, after some time, the same man, Kwamel Jeter, came to the front exterior door and opened it.[2] Detective Fogelman testified that when Mr. Jeter opened the door, he asked, "How ya doing, sir? Mind if we come in and talk to you?" In response, Mr. Jeter opened the door wider, which Detective Fogelman took to mean that Mr. Jeter was consenting to the detectives coming in. None of the detectives asked Mr. Jeter who he was, what his name was, whether he lived in the building or what he was doing there. Mr. Jeter never made any verbal response to Detective Fogelman's request to enter to speak with him.

The front door of the house opened to a small vestibule with two interior doors, each visibly bearing a lock—one leading into a first-floor apartment and the other leading to a set of stairs leading up to a separate apartment. Both doors were open. Although officers

---

[2] From this point on, the testimony of Mr. Jeter and Detective Fogelman diverge sharply as to the conduct of the police. The suppression court credited Detective Fogelman's testimony and the Appellate Division did not disturb that finding. We are therefore bound by it.

did not know whether Mr. Cuencas and Mr. Gavin lived on the first or second floor, Detective Fogelman saw Mr. Cuencas through the open door between the vestibule and the first-floor apartment. The detectives left the vestibule, entered into the first-floor apartment and then arrested Mr. Cuencas in the living room and Mr. Gavin in a bedroom, which was towards the rear of the apartment.

Officers transported Mr. Cuencas and Mr. Gavin to a Queens precinct and placed them in separate interrogation rooms. At some point, another officer recovered Cuencas's cell phone from him. At approximately 11:15 AM, a detective entered the room and gave Mr. Cuencas his *Miranda* warnings. Mr. Cuencas said that he waived his rights would speak to the detective.

After several hours of questioning, Mr. Cuencas confessed that he and Mr. Gavin had abducted Mr. Dudley. He said that he needed money and that Mr. Cruz, a drug dealer, offered to pay him for abducting Mr. Dudley, who was also a drug dealer. Mr. Cruz told Mr. Cuencas that he wanted to abduct Mr. Dudley so that Mr. Dudley's partner, Ali, would release Mr. Cruz's boss, Rob, whom Ali had abducted previously. Mr. Cruz assured Mr. Dudley and Mr. Gavin that their only role would be abducting Mr. Dudley, and that Mr. Dudley would not be hurt. Mr. Cuencas further told the police that he and Mr. Gavin led Mr. Dudley from his apartment to a waiting van. They remained with Mr. Dudley in the back as the van drove away but exited it a few minutes later. At the time they left, Mr. Dudley was alive.

The next day, while executing a search warrant on the apartment, police found the title for a Jaguar in the name of Victor Cruz in a safe located in one of the apartment's

bedrooms.  On a windowsill, police also found the keys to the car itself, which was parked across the street from the apartment.

Mr. Cuencas and Mr. Gavin were indicted on several charges including kidnapping, robbery, and felony murder.  The People theorized that Mr. Cruz had given Mr. Gavin the Jaguar as compensation for participation in the abduction—the extravagance of the gift was evidence that Mr. Gavin and Mr. Cuencas knew that Mr. Dudley would be killed.

Contending that the warrantless, nonconsensual entry into his home was unlawful, Mr. Cuencas moved to suppress the Jaguar title in Cruz's name and the cell phone, which contained pictures of Mr. Cuencas posing with the Jaguar.  Following a *Payton* hearing, although the suppression court rejected the People's argument that Mr. Cuencas did not have a reasonable expectation of privacy in the first-floor apartment, which it determined was Mr. Gavin's residence,[3] the it nonetheless denied Mr. Cuencas's motion.  The court based its decision on Detective Fogelman's testimony as to the circumstances under which the detectives gained permission to enter the vestibule and also on Mr. Jeter's testimony that his mother owned the entire building, that he had a key to the first-floor apartment, and that he could come and go as he pleased – information unknown to the detectives at the time the arrested Mr. Cuencas.

---

[3] The Appellate Division noted that it was bound by the suppression court's finding that Mr. Cuencas had an expectation of privacy in Mr. Gavin's residence (192 AD3d 109 at 112, citing *People v LaFontaine*, 92 NY2d 470 [1998]), and the People do not press that argument on appeal.  For readability reasons, we refer to the apartment as Mr. Cuencas's.

After a jury trial, Mr. Cuencas was convicted of two counts of Murder in the Second Degree (Penal Law. § 125.25 [3]) and one count of Robbery in the Second Degree (Penal Law § 160.10 [2] [b]). Mr. Cuencas was sentenced as a second felony offender to two concurrent prison terms of 25 years-to-life for the murder convictions and 15 years, with five years of post-release supervision, for the robbery conviction. The Appellate Division affirmed his conviction and upheld the denial of his suppression motion. The court determined that the detectives had gone to Mr. Cuencas's home for the specific purpose of arresting him and that Mr. Cuencas specifically raised the question of whether a warrantless home arrest conducted to delay the attachment of counsel violated the New York Constitution, but "decline[d] to find" that the intent of the police to conduct a warrantless arrest of Mr. Cuencas in his home created a "new category of *Payton* violations" because it saw "no viable path to resolving [the] question in the [Mr. Cuencas's] favor within the current framework of New York law" (192 AD3d 109, 113 [2d Dept 2020]). A Justice of the Appellate Division granted leave to appeal (37 NY3d 962).

We now reverse. The warrantless entry into Mr. Cuencas's home was not based on consent under the New York and United States Constitutions.

## II.

Mr. Cuencas challenges the suppression court's determination that Mr. Jeter had apparent authority to consent to the police entry of the downstairs apartment based on Detective Fogelman's testimony that there may have been two apartments inside the building and he did not know who Mr. Jeter was, and because Mr. Jeter only consented to police entry into the vestibule, not the apartment. The prosecution responds that Mr. Jeter

had apparent authority because he looked out the window of the first-floor apartment and opened the door to the building early in the morning, and because his testimony before the suppression court established that he had actual authority over the apartment.

Under Article 1, Section 12 of the New York Constitution and the Fourth Amendment of the United States Constitution that searches and seizures inside a home without a warrant are presumptively unreasonable (*People v Knapp*, 52 NY2d 689, 694 [1981]; *Payton v New York*, 445 US 573, 590 [1980] [explaining that with respect to the home, the Fourth Amendment draws a "firm line at the entrance to the house"]). Absent one of two narrow circumstances, exigent circumstances or voluntary consent, the police many not enter a private dwelling to arrest its occupant without an arrest warrant (*People v Levan*, 62 NY2d 139, 144 [1984]; *Payton*, 445 US at 587-588). Whether an individual voluntarily consented to a home's search is a question of fact, but the minimum factual showing necessary to constitute consent is a question of law (*People v McRay*, 51 NY2d 594, 601 [1980]).[4] Here, the testimony before the suppression court does not establish that the police had consent to enter Mr. Cuencas's home.

As a threshold matter, we clarify that the suppression court erred when it relied on facts not known to the police at the time they entered, such as Mr. Jeter's statement that he

---

[4] Our dissenting colleagues characterize the central issue in this case as a factual dispute, but acknowledge that whether the evidence here as to the reasonableness of the officers' belief that Mr. Jeter had the authority to consent to entry into the first-floor apartment and had given his consent to do so raises an issue as to the minimum showing necessary to establish third-party consent, which is a question of law (*cf. People v McRay*, 51 NY2d 594, 601 [1980]).

had keys to the apartment, that his mother owned the building, and that he was free to come and go into the downstairs apartment. Those facts are irrelevant to the issue of apparent authority, which turns solely on what the detectives knew or should have known at the time they entered (*see People v Adams*, 53 NY2d 1, 9 [1981] [whether an officer reasonably believed that an individual has apparent authority to consent to a warrantless home search is "based upon an objective view of the circumstances present" at the time of the search]). After all, guests sometimes answer a knock at their host's doors.

The United States Supreme Court first outlined third-party consent as an exception to the warrant requirement in *Coolidge v New Hampshire* (403 US 443 [1971])*, Schneckcloth v Bustamonte* (412 US 218 [1973]), and *United States v Matlock* (415 US 164 [194]). Together, those cases stand for the proposition that when "the prosecution seeks to justify a warrantless search by proof of voluntary consent," it "may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected" (*Matlock*, 415 US at 170-171). Common authority cannot be implied by the mere interest the third party has in the property (*Chapman v United States*, 365 US 610 [1961] [landlord could not validly consent to the search of a house he had rented to another]; *Stoner v California*, 376 US 483 [1964] [night hotel clerk could not validly consent to search of customer's room]).

In *Adams*, we held that under the Fourth Amendment of the United States Constitution, if "the searching officers rely in good faith on the apparent capability of an individual to consent to a search and the circumstances reasonably indicate that that

individual does, in fact, have the authority to consent, evidence obtained as the result of such a search should not be suppressed" (53 NY2d at 9-10). The standard set out in *Adams* is an objective one – whether a reasonable person could conclude that consent was given by someone with authority to do so. Subsequent United States Supreme Court law has analyzed the Fourth Amendment similarly (*see Illinois v Rodriguez*, 497 US 117, 188-189 [1990]).

Here, the circumstances do not reasonably indicate that Mr. Jeter had apparent authority to consent to the detectives' entry into Mr. Cuencas's apartment. The People contend that because the detectives knocked on the exterior door and window for several minutes, then saw a man peering out of the window near the front exterior door and the first-floor apartment door was open, it was reasonable, in view of the early hour, to conclude that the man opening the door had come from the first-floor apartment and no further inquiry was necessary.

The fundamental problem with the People's argument is that the officers never sought consent to enter Mr. Cuencas's apartment – only to enter the common vestibule to speak the person who answered the exterior door. The record shows that there were separate doors inside the vestibule, one for each of the two apartments in the building, each bearing a lock, and that each door was open. When the People asked Detective Fogelman to describe how he perceived the building upon his arrival at 5:30 AM, he testified that "It may have had two apartments, an upstairs and a downstairs." Detective Fogelman asked for consent to enter through the exterior door into the vestibule, not into either of the two

apartments, and it is not disputed that Mr. Cuencas's apartment had a door separating it from the vestibule.

Even if the detective's question could be interpreted as a request to search both, or either, of the apartments, the circumstances would not support a view that Mr. Jeter appeared to have the authority to consent. The People's reliance on *Adams* and *Rodriguez* is misplaced, as those cases show that a reasonable belief of apparent authority requires some claim of authority by the person granting consent. In both cases, the third party verbally communicated information to law enforcement that would lead a reasonable person to believe the third party had authority. In *Adams*, the person giving consent told the police about the weapons in the apartment, escorted the police to the apartment, and "gave them access by opening the door with a key she was carrying" (53 NY2d at 6). Likewise, in *Rodriguez*, the person granting consent "several times referred to the apartment as 'our' apartment" and "unlock[ed] the door with her key so that the officers could enter and arrest [the defendant]" (497 US at 179-80).

*People v John* (27 NY3d 294 [2016]), is also inapposite. There, a resident of a multi-family brownstone directed officers to the common basement of the building where she had seen the defendant enter with a gun – a basement that "did not have any areas designated for particular tenants" (*id.* at 297-98). *John* cited our decision in *People v. Leach* (21 NY3d 969 [2013]), a case in which we held that the defendant had no reasonable expectation of privacy in a bedroom that was not his, but was used by his grandmother to house visitors (*cf. People v Wood*, 31 NY2d 975, 976 [1973] [homeowner could lawfully consent to search of a boarder's bedroom in her house only because that room was not set

aside for the boarder's exclusive possession and use when the boarder shared it with the homeowner's 10-year-old son, over whom she had dominion]).

Here, the suppression court found that Mr. Cuencas had an expectation of privacy in the apartment. Thus, the very caselaw relied on the by the People shows that the minimum threshold for apparent authority under the New York and United States Constitutions requires some communication or conduct by the person giving consent to support a claim of authority. It would be a radical departure to say that so long as an unidentified person within a multi-family apartment building opens the building's exterior door at the request of the police, that person will be deemed to have had apparent authority to authorize a police search of the entire premises.[5] Here, all Detective Fogelman knew

---

[5] The Appellate Division cases relied on by the dissent demonstrate two things. First, there is no contrary decision from our Court.

Second, those cases cited by the dissent involving questions of third-party consent are fully consistent with our holding because every one of them involved instances in which police sought entry into a specified apartment *unit* within which they believed or knew the defendant to reside (*see People v Brown*, 234 AD2d 211, 213 [1st Dept 1996] *affd* 91 NY2d 854 [1997] [third-party consent by gesture when police knocked on the door to an apartment unit which had been explicitly identified by the victim as his assailant's residence]; *People v Washington*, 209 AD2d 817, 818 [3d Dept 1994] [third-party consent to enter an apartment unit when police, "long-time friends of the defendant's mother [who were] aware that the defendant resided with her," knocked on apartment unit door requesting to enter and the defendant's mother opened the door and stepped aside, giving no indication that they did not have permission to stay]); or when police knocked at a door leading directly into a residence, where it would be more reasonable (though not necessarily reasonable) to assume that someone inside the residence had authority to grant permission to search inside (*see People v Vazquez*, 206 AD3d 1621, 1623 [4th Dept 2022] [third-party consent when a person inside the defendant's single-family residence opened the door, stood aside and "gestured to [to police] to indicate that the defendant was inside" the home]).

was that Mr. Jeter answered the repeated knocking by the police at 5:30 AM by looking

through a window and then opening the front door; Mr. Jeter was neither of the suspects;

Mr. Jeter was not someone known to the detectives; and that the vestibule had two doors

within it, one of which was at the base of a staircase and both of which bore exterior-type

locks. The fact Mr. Jeter answered the door at 5:30 AM and the first-floor apartment door

was open, when Det. Fogelman could see there was a second door, cannot form the basis

of a reasonable belief that Mr. Jeter appeared to have authority to authorize the police to

enter the apartment. Even if the detectives knew that Mr. Jeter had been in the first-floor

---

Finally, none of the other cases cited by the dissent involved third-party consent (*see People v Putnam*, 50 AD3d 1514, 1514 [4th Dept 2008] ["The evidence at the suppression hearing establish[ed] that *defendant* left the door open and did not object to the officer's presence in *his* home"] [emphasis added] [internal citations omitted]; *People v Gonzalez* (222 AD2d 453 [2d Dept 1995] [defendant consented by conduct to entry into *her* home]; *People v Taylor*, 111 AD2d 520, 520-521 [3d Dept 1985] [defendant consented to entry when officers, acting on identifying information from a police informant and a motel front-desk clerk, knocked on the defendant's motel room door, defendant answered, stepped back from the door, and then officers walked in], *lv denied* 66 NY2d 618 [1985] [emphasis added]; *United States v Grant* (371 Fed Appx 228 [2d Cir 2010]) [defendant whose identity and address were known to police, consented by conduct to entry into his apartment unit when he admitted police into the apartment building vestibule and did not object to officers following him into his apartment]); *United States v Sabo*, 724 F3d 891, 893-894 [7th Cir 2013] [defendant whose identity and address were known to police implicitly consented to an officer's entry into his trailer home when he answered the officer's knock at the trailer door, then stepped back and aside, letting the door open, in direct response to the officer's request to enter]).

None of those cases involves a situation in which a third-party unknown to the police was deemed to have granted consent to enter an interior apartment unit merely by opening an exterior door to the common area of a multi-apartment building and standing aside as the police entered. Unlike here, none of these cases involve an inference of consent to enter an apartment unit from an unknown third-party's consent to enter an apartment building common area.

apartment shortly before answering the door, something more would be required to establish a reasonable belief of apparent authority, such as Mr. Jeter identifying himself the building's landlord, displaying keys to the first-floor apartment, or unlocking and entering the apartment.

In contrast to the circumstances in which third parties have been determined to have sufficient apparent authority to consent to the search of a home, the People admit that Mr. Jeter did not say a single word to the detectives and the detectives did not ask any question of Mr. Jeter other than whether they could enter the vestibule to speak with him. The belief that Mr. Jeter came from the first-floor apartment of a multi-family building to answer the door is insufficient to establish his apparent authority absent some affirmative statement claiming authority or concrete demonstration of authority (*see, e.g. People v Petrie*, 453 NYS2d 725, 727 [2d Dept 1982] ["Nor may the police proceed without making some inquiry into the actual state of authority when they are faced with a situation which would cause a reasonable person to question the consenting party's power or control over the premises or property to be inspected"]; *People v Ponto*, 103 AD2d 573 [2d Dept 1984] [resident of a home lacked apparent authority to consent to search of the bedroom he did not occupy]).

Based on the facts known to them at the time and the reasonable inferences to be drawn therefrom, the detectives' belief that Mr. Jeter had apparent authority was not reasonable. The warrantless entry into the first-floor apartment therefore violated Mr. Cuencas's rights under the New York and Federal Constitutions.

III.

Finally, we agree with Mr. Cuencas's contention that the case must be remitted to Supreme Court to determine whether any evidence obtained as a result of the illegal search is sufficiently attenuated from the illegal arrest.[6]  Mr. Cuencas's remaining contentions do not compel a different result on this appeal.  Accordingly, the order of the Appellate Division should be reversed, and case remitted to Supreme Court for further proceedings in accordance with this opinion.

---

[6] The People represent to this Court that they do not contend that the recovery of Mr. Cuencas's cell phone was attenuated from the illegal arrest.

CANNATARO, J. (dissenting):

It is well settled that "[t]he determination as to whether police received voluntary consent to enter [a dwelling is] a mixed question of law and fact" (*People v Xochimitl*, 32 NY3d 1026, 1027 [2018]). Such mixed questions are "beyond our review if there is record support for the . . . conclusion" of the courts below (*People v Parker*, 32 NY3d 49, 55 [2018]). The majority correctly acknowledges that whether an individual voluntarily

- 1 -

consented to a police search generally presents a mixed question of law and fact (*see People v Valerio*, 95 NY2d 924, 925 [2000]) but concludes that "the undisputed facts do not meet the threshold requirement for" a determination that consent to search was present as a matter of law (*People v McRay*, 51 NY2d 594, 601 [1980]). I disagree. Because reasonable minds could draw different inferences from the established facts and "it simply cannot be said that *no* record support exists for" the suppression court's determination (*People v Howard*, 22 NY3d 388, 403 [2013] [emphasis added]), this Court is precluded from disturbing it. Therefore, I respectfully dissent.

At the suppression hearing, the arresting officer testified that, after receiving no response to their early-morning knocks on the front door of the two-family apartment building where defendant Tramel Cuencas lived, police knocked on the front window of the building's ground floor apartment. They saw an individual, later determined to be Kwamel Jeter, peer out at them through the apartment window. A few moments later, Jeter opened the front door. When the police asked if they could come in to talk to him, Jeter "stepped aside" and opened the door wider, revealing a small vestibule with two doors, one leading to a staircase and one leading into the apartment from which police had just seen Jeter through the window. As the police entered the vestibule and proceeded towards the open apartment door, Jeter did not give any indication that they were not permitted to continue into the apartment or that he wanted them to remain in the vestibule. The officers

interpreted Jeter's actions as consent to enter not only the vestibule but also the apartment, where they found defendant sitting on a couch and arrested him.[1]

Although the scope of Jeter's consent is certainly open to dispute, there is evidence in the record supporting the inference that his actions conveyed tacit consent for the four police officers to enter the open apartment that he had just come from and was not limited to the small vestibule. Because either view is supportable on this record, this Court has no power to disturb the lower court's finding (*see Parker*, 32 NY3d at 55). But rather than assessing whether there was any support in the record for the hearing court's determination, the majority substitutes its own view of the evidence and, in doing so, ignores the well-settled standard for mixed questions.

The majority begins by discussing the finding of the courts below that Jeter had ostensible control over the apartment in which police discovered defendant. It notes that certain pieces of evidence relied on by the hearing court, such as Jeter's possession of keys to the apartment, or the fact that his mother owned the entire building, were not known to the police at the time of the arrest and thus cannot be relevant to determining whether valid consent was given. But this evidence, which was not mentioned at all in the Appellate Division's affirmance, is not the only evidence supporting the lower court's determination. Rather, as explained above, the testimony from the arresting officer as to his interactions with Jeter immediately prior to entering the apartment supports a finding that Jeter tacitly

---

[1] Although the majority refers to locks on both doors, the record contains no indication that Detective Fogelman was aware of any lock on the open ground-floor apartment door.

consented to their entry. Thus, the fact that the hearing court may have improperly relied on certain pieces of evidence is irrelevant to the question of record support.

More problematic is the majority's assertion that Jeter's actions, as a matter of law, could not have been interpreted as providing the police with consent to enter. In so asserting, the majority ignores caselaw establishing the possibility that consent can be gleaned from a person's conduct and explicit verbal communication is not required (*see e.g. People v Vazquez*, 206 AD3d 1621, 1623 [4th Dept 2022] [finding that consent to enter home was given through a gesture], *lv denied* 39 NY3d 965 [2022, Wilson, J.]; *People v Putnam*, 50 AD3d 1514, 1514 [4th Dept 2008] [finding that consent to enter was given where an individual left his door open and did not object to the police entry], *lv denied* 10 NY3d 963 [2008]; *People v Brown*, 234 AD2d 211, 213 [1st Dept 1996] [finding consent where, in response to a request from police to enter an apartment an individual walked away from the door, leaving it open], *affd* 91 NY2d 854 [1997]; *People v Gonzalez*, 222 AD2d 453 [2d Dept 1995] ["by the defendant's conduct, she effectively consented, if not explicitly, then tacitly, to the police officers' entry and presence in her home by failing to ask them to leave or in any other manner indicating that they did not have her permission to remain"], *lv denied* 88 NY2d 848 [1996]; *People v Washington*, 209 AD2d 817, 818-819 [3d Dept 1994] [finding that consent to enter a home was given when the person opening the door stepped aside to allow police to enter], *lv denied* 85 NY2d 944 [1995]; *People v Taylor*, 111 AD2d 520, 521 [3d Dept 1985] [the "defendant's conduct in stepping back from the open door amounted to consent for the officers to enter"], *lv denied* 66 NY2d

618 [1985]; *see also United States v Sabo*, 724 F3d 891, 893-894 [7th Cir 2013] [the defendant consented to entry when, in response to a request to enter, he stepped back and to the side]; *United States v Grant*, 371 Fed Appx 228, 229 [2d Cir 2010] [the defendant consented to entry when he opened the door to his apartment building and, in response to officers asking to speak to him, turned and walked into his apartment]).

The few Appellate Division cases cited in support of the majority's holding are clearly distinguishable. In both *People v Petrie* (89 AD2d 910 [2d Dept 1982]) and *People v Ponto* (103 AD2d 573 [2d Dept 1984]), police were granted entry to a home by a third-party resident, but required additional consent to search a specific bedroom, which that third party did not have the authority to give. The relevant question here is whether Jeter had apparent authority to give consent for the police to enter the apartment, not whether he had the authority to consent to a search of a specific room within that apartment. While, as the majority states, guests may sometimes answer a knock at their host's door, it was not unreasonable under the circumstances presented in this particular case for police to believe that Jeter had the authority to consent to entry, given that he had apparently just emerged from that apartment (*see People v Adams*, 53 NY2d 1, 9 [1981] [search proper where "the circumstances reasonably indicate that (an) individual . . . (had) the authority to consent"]).

Relatedly, although the majority suggests otherwise (majority op, at 11), this is not a situation in which the police claimed consent to search an entire building based merely on someone opening the exterior door of a multi-family residence. To be sure, consent to

enter the common areas of a multi-family building does not give police the authority to enter every apartment in that building (*see People v Gordon*, 36 NY3d 420, 426-27 [2021]). However, the question here is limited to whether there was sufficient evidence in the record before the suppression court to support a finding that Jeter consented to police both entering the small common vestibule and continuing through the open door into the apartment that he had just come from.

Any number of perfectly reasonable hearing court judges might have determined based on this record that there was only consent to enter the vestibule and not the apartment, or even that there was no consent at all. Our role at this Court, however, is not to substitute our judgment for that of the hearing court but rather to decide whether there was any record support for the determination reached below (*see People v Morales*, 42 NY2d 129, 138 [1977] [explaining that even if the issue of whether consent was given is "open to dispute, our power to review . . . is limited"], *cert denied* 434 US 1018 [1978]). Here, because the testimony of the arresting officer regarding his interaction with Jeter supports the determination that Jeter consented to police entry into the apartment, our analysis must end there. I would therefore affirm the Appellate Division order.

Order reversed and case remitted to Supreme Court, Kings County, for further proceedings in accordance with the opinion herein. Opinion by Chief Judge Wilson. Judges Rivera, Troutman and Halligan concur. Judge Cannataro dissents in an opinion, in which Judges Garcia and Singas concur.

Decided November 21, 2023